## UNITED STATES ET AL. *v.* EDGE BROADCASTING CO., T/A POWER 94

No. 92–486.   Argued April 21, 1993—Decided June 25, 1993

WHITE, J., delivered the opinion of the Court with respect to Parts I, II, and IV, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined, the opinion of the Court with respect to Parts III–A and III–B, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined, the opinion of the Court with respect to Part III–C, in which REHNQUIST, C. J., and KENNEDY, SOUTER, and THOMAS, JJ., joined, and an opinion with respect to Part III–D, in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined. SOUTER, J., filed an opinion concurring in part, in which KENNEDY, J., joined, *post,* p. 436. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post,* p. 436.

*Paul J. Larkin, Jr.,* argued the cause for petitioners. With him on the briefs were *Solicitor General Starr, Acting Solicitor General Bryson, Assistant Attorney General Gerson,* and *Deputy Solicitor General Roberts.*

*Conrad M. Shumadine* argued the cause for respondent. With him on the brief was *Walter D. Kelley, Jr.**

---

*Briefs of *amici curiae* urging affirmance were filed for the Association of National Advertisers, Inc., et al. by *Burt Neuborne* and *Gilbert H. Weil;* and for the National Association of Broadcasters et al. by *P. Cameron DeVore, Marshall J. Nelson, John Kamp, Steven R. Shapiro, John A. Powell, Barbara W. Wall, Kenneth M. Vittor, Slade R. Metcalf, Richard E. Wiley, David P. Fleming, John F. Sturm, René P. Milam, Mark J. Prak, L. Stanley Paige, Bruce W. Sanford,* and *Henry S. Hoberman.*

JUSTICE WHITE delivered the opinion of the Court, except as to Part III–D.*

In this case we must decide whether federal statutes that prohibit the broadcast of lottery advertising by a broadcaster licensed to a State that does not allow lotteries, while allowing such broadcasting by a broadcaster licensed to a State that sponsors a lottery, are, as applied to respondent, consistent with the First Amendment.

I

While lotteries have existed in this country since its founding, States have long viewed them as a hazard to their citizens and to the public interest, and have long engaged in legislative efforts to control this form of gambling. Congress has, since the early 19th century, sought to assist the States in controlling lotteries. See, e. g., Act of Mar. 2, 1827, § 6, 4 Stat. 238; Act of July 27, 1868, § 13, 15 Stat. 196; Act of June 8, 1872, § 149, 17 Stat. 302. In 1876, Congress made it a crime to deposit in the mails any letters or circulars concerning lotteries, whether illegal or chartered by state legislatures. See Act of July 12, 1876, ch. 186, § 2, 19 Stat. 90, codified at Rev. Stat. § 3894 (2d ed. 1878). This Court rejected a challenge to the 1876 Act on First Amendment grounds in Ex parte Jackson, 96 U. S. 727 (1878). In response to the persistence of lotteries, particularly the Louisiana Lottery, Congress closed a loophole allowing the advertisement of lotteries in newspapers in the Anti-Lottery Act of 1890, ch. 908, § 1, 26 Stat. 465, codified at Supp. to Rev. Stat. § 3894 (2d ed. 1891), and this Court upheld that Act against a First Amendment challenge in In re Rapier, 143

---

*JUSTICE O'CONNOR joins Parts I, II, III–A, III–B, and IV of this opinion. JUSTICE SCALIA joins all but Part III–C of this opinion. JUSTICE KENNEDY joins Parts I, II, III–C, and IV of this opinion. JUSTICE SOUTER joins all but Parts III–A, III–B, and III–D of this opinion.

U. S. 110 (1892). When the Louisiana Lottery moved its operations to Honduras, Congress passed the Act of Mar. 2, 1895, 28 Stat. 963, 18 U. S. C. § 1301, which outlawed the transportation of lottery tickets in interstate or foreign commerce. This Court upheld the constitutionality of that Act against a claim that it exceeded Congress' power under the Commerce Clause in *Lottery Case,* 188 U. S. 321 (1903). This federal antilottery legislation remains in effect. See 18 U. S. C. §§ 1301, 1302.

After the advent of broadcasting, Congress extended the federal lottery control scheme by prohibiting, in § 316 of the Communications Act of 1934, 48 Stat. 1088, the broadcast of "any advertisement of or information concerning any lottery, gift enterprise, or similar scheme." 18 U. S. C. § 1304, as amended by the Charity Games Advertising Clarification Act of 1988, Pub. L. 100–625, § 3(a)(4), 102 Stat. 3206.[1] In 1975, Congress amended the statutory scheme to allow newspapers and broadcasters to advertise state-run lotteries if the newspaper is published in or the broadcast station is licensed to a State which conducts a state-run lottery. See 18 U. S. C. § 1307 (1988 ed., Supp. III).[2] This exemption was

---

[1] Title 18 U. S. C. § 1304 (1988 ed., Supp. III) provides:

"Broadcasting lottery information

"Whoever broadcasts by means of any radio or television station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

[2] Title 18 U. S. C. § 1307 (1988 ed. and Supp. III) provides in relevant part:

"Exceptions relating to certain advertisements and other information and to State-conducted lotteries

"(a) The provisions of sections 1301, 1302, 1303, and 1304 shall not apply to—

enacted "to accommodate the operation of legally authorized State-run lotteries consistent with continued Federal protection to the policies of non-lottery States." S. Rep. No. 93–1404, p. 2 (1974). See also H. R. Rep. No. 93–1517, p. 5 (1974).

North Carolina does not sponsor a lottery, and participating in or advertising nonexempt raffles and lotteries is a crime under its statutes. N. C. Gen. Stat. §§ 14–289 and 14–291 (1986 and Supp. 1992). Virginia, on the other hand, has chosen to legalize lotteries under a state monopoly and has entered the marketplace vigorously.

Respondent, Edge Broadcasting Company (Edge), owns and operates a radio station licensed by the Federal Communications Commission (FCC) to Elizabeth City, North Carolina. This station, known as "Power 94," has the call letters WMYK–FM and broadcasts from Moyock, North Carolina, which is approximately three miles from the border between Virginia and North Carolina and considerably closer to Virginia than is Elizabeth City. Power 94 is one of 24 radio stations serving the Hampton Roads, Virginia, metropolitan area; 92.2% of its listening audience are Virginians; the rest, 7.8%, reside in the nine North Carolina counties served by

"(1) an advertisement, list of prizes, or other information concerning a lottery conducted by a State acting under the authority of State law which is—

"(A) contained in a publication published in that State or in a State which conducts such a lottery; or

"(B) broadcast by a radio or television station licensed to a location in that State or a State which conducts such a lottery; or

"(2) an advertisement, list of prizes, or other information concerning a lottery, gift enterprise, or similar scheme, other than one described in paragraph (1), that is authorized or not otherwise prohibited by the State in which it is conducted and which is—

"(A) conducted by a not-for-profit organization or a governmental organization; or

"(B) conducted as a promotional activity by a commercial organization and is clearly occasional and ancillary to the primary business of that organization."

Power 94. Because Edge is licensed to serve a North Carolina community, the federal statute prohibits it from broadcasting advertisements for the Virginia lottery. Edge derives 95% of its advertising revenue from Virginia sources, and claims that it has lost large sums of money from its inability to carry Virginia lottery advertisements.

Edge entered federal court in the Eastern District of Virginia, seeking a declaratory judgment that, as applied to it, §§ 1304 and 1307, together with corresponding FCC regulations, violated the First Amendment to the Constitution and the Equal Protection Clause of the Fourteenth, as well as injunctive protection against the enforcement of those statutes and regulations.

The District Court recognized that Congress has greater latitude to regulate broadcasting than other forms of communication. App. to Pet. for Cert. 14a–15a. The District Court construed the statutes not to cover the broadcast of noncommercial information about lotteries, a construction that the Government did not oppose. With regard to the restriction on advertising, the District Court evaluated the statutes under the established four-factor test for commercial speech set forth in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 566 (1980):

> "At the outset, we must determine whether the expression is protected by the First Amendment. [1] For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask [2] whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine [3] whether the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest."

Assuming that the advertising Edge wished to air would deal with the Virginia lottery, a legal activity, and would not be misleading, the court went on to hold that the second and

fourth *Central Hudson* factors were satisfied: the statutes were supported by a substantial governmental interest, and the restrictions were no more extensive than necessary to serve that interest, which was to discourage participating in lotteries in States that prohibited lotteries. The court held, however, that the statutes, as applied to Edge, did not directly advance the asserted governmental interest, failed the *Central Hudson* test in this respect, and hence could not be constitutionally applied to Edge. A divided Court of Appeals, in an unpublished *per curiam* opinion,[3] affirmed in all respects, also rejecting the Government's submission that the District Court had erred in judging the validity of the statutes on an "as applied" standard, that is, determining whether the statutes directly served the governmental interest in a substantial way solely on the effect of applying them to Edge. Judgt. order reported at 956 F. 2d 263 (CA4 1992).

Because the court below declared a federal statute unconstitutional and applied reasoning that was questionable under our cases relating to the regulation of commercial speech, we granted certiorari. 506 U. S. 1032 (1992). We reverse.

## II

The Government argues first that gambling implicates no constitutionally protected right, but rather falls within a category of activities normally considered to be "vices," and that the greater power to prohibit gambling necessarily includes the lesser power to ban its advertisement; it argues that we therefore need not proceed with a *Central Hudson* analysis. The Court of Appeals did not address this issue and neither do we, for the statutes are not unconstitutional under the standards of *Central Hudson* applied by the courts below.

---

[3] We deem it remarkable and unusual that although the Court of Appeals affirmed a judgment that an Act of Congress was unconstitutional as applied, the court found it appropriate to announce its judgment in an unpublished *per curiam* opinion.

## III

For most of this Nation's history, purely commercial advertising was not considered to implicate the constitutional protection of the First Amendment. See *Valentine* v. *Chrestensen*, 316 U. S. 52, 54 (1942). In 1976, the Court extended First Amendment protection to speech that does no more than propose a commercial transaction. See *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748 (1976). Our decisions, however, have recognized the "'common-sense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 455–456 (1978). The Constitution therefore affords a lesser protection to commercial speech than to other constitutionally guaranteed expression. *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 477 (1989); *Central Hudson, supra*, at 563; *Ohralik, supra*, at 456.

In *Central Hudson*, we set out the general scheme for assessing government restrictions on commercial speech. 447 U. S., at 566. Like the courts below, we assume that Edge, if allowed to, would air nonmisleading advertisements about the Virginia lottery, a legal activity. As to the second *Central Hudson* factor, we are quite sure that the Government has a substantial interest in supporting the policy of nonlottery States, as well as not interfering with the policy of States that permit lotteries. As in *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328 (1986), the activity underlying the relevant advertising—gambling—implicates no constitutionally protected right; rather, it falls into a category of "vice" activity that could be, and frequently has been, banned altogether. As will later be discussed, we also agree that the statutes are no broader than necessary to advance the Government's interest and hence the fourth part of the *Central Hudson* test is satisfied.

The Court of Appeals, however, affirmed the District Court's holding that the statutes were invalid because, as applied to Edge, they failed to advance directly the governmental interest supporting them. According to the Court of Appeals, whose judgment we are reviewing, this was because the 127,000 people who reside in Edge's nine-county listening area in North Carolina receive most of their radio, newspaper, and television communications from Virginia-based media. These North Carolina residents who might listen to Edge "are inundated with Virginia's lottery advertisements" and hence, the court stated, prohibiting Edge from advertising Virginia's lottery "is ineffective in shielding North Carolina residents from lottery information." This "ineffective or remote measure to support North Carolina's desire to discourage gambling cannot justify infringement upon commercial free speech." App. to Pet. for Cert. 6a, 7a. In our judgment, the courts below erred in that respect.

## A

The third *Central Hudson* factor asks whether the "regulation directly advances the governmental interest asserted." 447 U. S., at 566. It is readily apparent that this question cannot be answered by limiting the inquiry to whether the governmental interest is directly advanced as applied to a single person or entity. Even if there were no advancement as applied in that manner—in this case, as applied to Edge—there would remain the matter of the regulation's general application to others—in this case, to all other radio and television stations in North Carolina and country-wide. The courts below thus asked the wrong question in ruling on the third *Central Hudson* factor. This is not to say that the validity of the statutes' application to Edge is an irrelevant inquiry, but that issue properly should be dealt with under the fourth factor of the *Central Hudson* test. As we have said, "[t]he last two steps of the *Central Hudson* analysis basically involve a consideration of the 'fit' between

the legislature's ends and the means chosen to accomplish those ends." *Posadas, supra,* at 341.

We have no doubt that the statutes directly advanced the governmental interest at stake in this case. In response to the appearance of state-sponsored lotteries, Congress might have continued to ban all radio or television lottery advertisements, even by stations in States that have legalized lotteries. This it did not do. Neither did it permit stations such as Edge, located in a nonlottery State, to carry lottery ads if their signals reached into a State that sponsors lotteries; similarly, it did not forbid stations in a lottery State such as Virginia from carrying lottery ads if their signals reached into an adjoining State such as North Carolina where lotteries were illegal. Instead of favoring either the lottery or the nonlottery State, Congress opted to support the antigambling policy of a State like North Carolina by forbidding stations in such a State to air lottery advertising. At the same time it sought not to unduly interfere with the policy of a lottery-sponsoring State such as Virginia. Virginia could advertise its lottery through radio and television stations licensed to Virginia locations, even if their signals reached deep into North Carolina. Congress surely knew that stations in one State could often be heard in another but expressly prevented each and every North Carolina station, including Edge, from carrying lottery ads. Congress plainly made the commonsense judgment that each North Carolina station would have an audience in that State, even if its signal reached elsewhere and that enforcing the statutory restriction would insulate each station's listeners from lottery ads and hence advance the governmental purpose of supporting North Carolina's laws against gambling. This congressional policy of balancing the interests of lottery and nonlottery States is the substantial governmental interest that satisfies *Central Hudson,* the interest which the courts below did not fully appreciate. It is also the interest that is directly served by applying the statutory restriction to all

stations in North Carolina; and this would plainly be the case even if, as applied to Edge, there were only marginal advancement of that interest.

## B

Left unresolved, of course, is the validity of applying the statutory restriction to Edge, an issue that we now address under the fourth *Central Hudson* factor, *i. e.*, whether the regulation is more extensive than is necessary to serve the governmental interest. We revisited that aspect of *Central Hudson* in *Board of Trustees of State Univ. of N. Y. v. Fox*, 492 U. S. 469 (1989), and concluded that the validity of restrictions on commercial speech should not be judged by standards more stringent than those applied to expressive conduct entitled to full First Amendment protection or to relevant time, place, or manner restrictions. *Id.*, at 477–478. We made clear in *Fox* that our commercial speech cases require a fit between the restriction and the government interest that is not necessarily perfect, but reasonable. *Id.*, at 480. This was also the approach in *Posadas*, 478 U. S., at 344.

We have no doubt that the fit in this case was a reasonable one. Although Edge was licensed to serve the Elizabeth City area, it chose to broadcast from a more northerly position, which allowed its signal to reach into the Hampton Roads, Virginia, metropolitan area. Allowing it to carry lottery ads reaching over 90% of its listeners, all in Virginia, would surely enhance its revenues. But just as surely, because Edge's signals with lottery ads would be heard in the nine counties in North Carolina that its broadcasts reached, this would be in derogation of the substantial federal interest in supporting North Carolina's laws making lotteries illegal. In this posture, to prevent Virginia's lottery policy from dictating what stations in a neighboring State may air, it is reasonable to require Edge to comply with the restriction against carrying lottery advertising. In other words, applying the restriction to a broadcaster such as Edge directly

advances the governmental interest in enforcing the restriction in nonlottery States, while not interfering with the policy of lottery States like Virginia. We think this would be the case even if it were true, which it is not, that applying the general statutory restriction to Edge, in isolation, would no more than marginally insulate the North Carolinians in the North Carolina counties served by Edge from hearing lottery ads.

In *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989), we dealt with a time, place, or manner restriction that required the city to control the sound level of musical concerts in a city park, concerts that were fully protected by the First Amendment. We held there that the requirement of narrow tailoring was met if "the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," provided that it did not burden substantially more speech than necessary to further the government's legitimate interests. *Id.*, at 799 (internal quotation marks omitted). In the course of upholding the restriction, we went on to say that "the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case." *Id.*, at 801.

The *Ward* holding is applicable here, for we have observed that the validity of time, place, or manner restrictions is determined under standards very similar to those applicable in the commercial speech context and that it would be incompatible with the subordinate position of commercial speech in the scale of First Amendment values to apply a more rigid standard to commercial speech than is applied to fully protected speech. *Fox, supra,* at 477, 478. *Ward* thus teaches us that we judge the validity of the restriction in this case by the relation it bears to the general problem of accommodating the policies of both lottery and nonlottery States, not

by the extent to which it furthers the Government's interest in an individual case.

This is consistent with the approach we have taken in the commercial speech context. In *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S., at 462, for example, an attorney attacked the validity of a rule against solicitation "not facially, but as applied to his acts of solicitation." We rejected the appellant's view that his "as applied" challenge required the State to show that his particular conduct in fact trenched on the interests that the regulation sought to protect. We stated that in the general circumstances of the appellant's acts, the State had "a strong interest in adopting and enforcing rules of conduct designed to protect the public." *Id.*, at 464. This having been established, the State was entitled to protect its interest by applying a prophylactic rule to those circumstances generally; we declined to require the State to go further and to prove that the state interests supporting the rule actually were advanced by applying the rule in Ohralik's particular case.

*Edenfield* v. *Fane*, 507 U. S. 761 (1993), is not to the contrary. While treating Fane's claim as an as applied challenge to a broad category of commercial solicitation, we did not suggest that Fane could challenge the regulation on commercial speech as applied only to himself or his own acts of solicitation.

## C

We also believe that the courts below were wrong in holding that as applied to Edge itself, the restriction at issue was ineffective and gave only remote support to the Government's interest.

As we understand it, both the Court of Appeals and the District Court recognized that Edge's potential North Carolina audience was the 127,000 residents of nine North Carolina counties, that enough of them regularly or from time to time listen to Edge to account for 11% of all radio listening in those counties, and that while listening to Edge they heard

no lottery advertisements. It could hardly be denied, and neither court below purported to deny, that these facts, standing alone, would clearly show that applying the statutory restriction to Edge would directly serve the statutory purpose of supporting North Carolina's antigambling policy by excluding invitations to gamble from 11% of the radio listening time in the nine-county area. Without more, this result could hardly be called either "ineffective," "remote," or "conditional," see *Central Hudson*, 447 U. S., at 564, 569. Nor could it be called only "limited incremental support," *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 73 (1983), for the Government interest, or thought to furnish only speculative or marginal support. App. to Pet. for Cert. 24a, 25a. Otherwise, any North Carolina radio station with 127,000 or fewer potential listeners would be permitted to carry lottery ads because of its marginal significance in serving the State's interest.

Of course, both courts below pointed out, and rested their judgment on the fact, that the 127,000 people in North Carolina who might listen to Edge also listened to Virginia radio stations and television stations that regularly carried lottery ads. Virginia newspapers carrying such material also were available to them. This exposure, the courts below thought, was sufficiently pervasive to prevent the restriction on Edge from furnishing any more than ineffective or remote support for the statutory purpose. We disagree with this conclusion because in light of the facts relied on, it represents too limited a view of what amounts to direct advancement of the governmental interest that is present in this case.

Even if all of the residents of Edge's North Carolina service area listen to lottery ads from Virginia stations, it would still be true that 11% of radio listening time in that area would remain free of such material. If Edge is allowed to advertise the Virginia lottery, the percentage of listening time carrying such material would increase from 38% to 49%.

We do not think that *Central Hudson* compels us to consider this consequence to be without significance.

The Court of Appeals indicated that Edge's potential audience of 127,000 persons were "inundated" by the Virginia media carrying lottery advertisements. But the District Court found that only 38% of all radio listening in the nine-county area was directed at stations that broadcast lottery advertising.[4] With respect to television, the District Court observed that American adults spend 60% of their media consumption time listening to, or watching, television. The evidence before it also indicated that in four of the nine counties served by Edge, 75% of all television viewing was directed at Virginia stations; in three others, the figure was between 50 and 75%; and in the remaining two counties, between 25 and 50%. Even if it is assumed that all of these stations carry lottery advertising, it is very likely that a great many people in the nine-county area are exposed to very little or no lottery advertising carried on television. Virginia newspapers are also circulated in Edge's area, 10,400 daily and 12,500 on Sundays, hardly enough to constitute a pervasive exposure to lottery advertising, even on the unlikely assumption that the readers of those newspapers always look for and read the lottery ads. Thus the District Court observed only that "a *significant* number of residents of [the nine-county] area listens to" Virginia radio and television stations and read Virginia newspapers. App. to Pet. for Cert. 25a (emphasis added).

Moreover, to the extent that the courts below assumed that §§ 1304 and 1307 would have to effectively shield North Carolina residents from information about lotteries to advance their purpose, they were mistaken. As the Government asserts, the statutes were not "adopt[ed] . . . to keep

---

[4] It would appear, then, that 51% of the radio listening time in the relevant nine counties is attributable to other North Carolina stations or other stations not carrying lottery advertising.

North Carolina residents ignorant of the Virginia Lottery for ignorance's sake," but to accommodate nonlottery States' interest in discouraging public participation in lotteries, even as they accommodate the countervailing interests of lottery States. Reply Brief for Petitioners 11. Within the bounds of the general protection provided by the Constitution to commercial speech, we allow room for legislative judgments. *Fox,* 492 U. S., at 480. Here, as in *Posadas de Puerto Rico,* the Government obviously legislated on the premise that the advertising of gambling serves to increase the demand for the advertised product. See *Posadas,* 478 U. S., at 344. See also *Central Hudson, supra,* at 569. Congress clearly was entitled to determine that broadcast of promotional advertising of lotteries undermines North Carolina's policy against gambling, even if the North Carolina audience is not wholly unaware of the lottery's existence. Congress has, for example, altogether banned the broadcast advertising of cigarettes, even though it could hardly have believed that this regulation would keep the public wholly ignorant of the availability of cigarettes. See 15 U. S. C. § 1335. See also *Queensgate Investment Co.* v. *Liquor Control Comm'n,* 69 Ohio St. 2d 361, 366, 433 N. E. 138, 142 (alcohol advertising), app. dism'd for want of a substantial federal question, 459 U. S. 807 (1982). Nor do we require that the Government make progress on every front before it can make progress on any front. If there is an immediate connection between advertising and demand, and the federal regulation decreases advertising, it stands to reason that the policy of decreasing demand for gambling is correspondingly advanced. Accordingly, the Government may be said to advance its purpose by substantially reducing lottery advertising, even where it is not wholly eradicated.

Thus, even if it were proper to conduct a *Central Hudson* analysis of the statutes only as applied to Edge, we would not agree with the courts below that the restriction at issue

here, which prevents Edge from broadcasting lottery advertising to its sizable radio audience in North Carolina, is rendered ineffective by the fact that Virginia radio and television programs can be heard in North Carolina. In our view, the restriction, even as applied only to Edge, directly advances the governmental interest within the meaning of *Central Hudson.*

D

Nor need we be blind to the practical effect of adopting respondent's view of the level of particularity of analysis appropriate to decide its case. Assuming for the sake of argument that Edge had a valid claim that the statutes violated *Central Hudson* only as applied to it, the piecemeal approach it advocates would act to vitiate the Government's ability generally to accommodate States with differing policies. Edge has chosen to transmit from a location near the border between two jurisdictions with different rules, and rests its case on the spillover from the jurisdiction across the border. Were we to adopt Edge's approach, we would treat a station that is close to the line as if it were on the other side of it, effectively extending the legal regime of Virginia inside North Carolina. One result of holding for Edge on this basis might well be that additional North Carolina communities, farther from the Virginia border, would receive broadcast lottery advertising from Edge. Broadcasters licensed to these communities, as well as other broadcasters serving Elizabeth City, would then be able to complain that lottery advertising from Edge and other similar broadcasters renders the federal statute ineffective as applied to them. Because the approach Edge advocates has no logical stopping point once state boundaries are ignored, this process might be repeated until the policy of supporting North Carolina's ban on lotteries would be seriously eroded. We are unwilling to start down that road.

## IV

Because the statutes challenged here regulate commercial speech in a manner that does not violate the First Amendment, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE SOUTER, with whom JUSTICE KENNEDY joins, concurring in part.

I agree with the Court that the restriction at issue here is constitutional under our decision in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980), even if that restriction is judged "as applied to Edge itself." *Ante,* at 431. I accordingly believe it unnecessary to decide whether the restriction might appropriately be reviewed at a more lenient level of generality, and I take no position on that question.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

Three months ago this Court reaffirmed that the proponents of a restriction on commercial speech bear the burden of demonstrating a "reasonable fit" between the legislature's goals and the means chosen to effectuate those goals. See *Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 416 (1993). While the " 'fit' " between means and ends need not be perfect, an infringement on constitutionally protected speech must be " 'in proportion to the interest served.' " *Id.*, at 417, n. 12 (quoting *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 480 (1989)). In my opinion, the Federal Government's selective ban on lottery advertising unquestionably flunks that test; for the means chosen by the Government, a ban on speech imposed for the purpose of manipulating public behavior, is in no way proportionate to the Federal Government's asserted interest in protecting the antilottery policies of nonlottery States. Accordingly, I respectfully dissent.

As the Court acknowledges, the United States does not assert a general interest in restricting state-run lotteries. Indeed, it could not, as it has affirmatively removed restrictions on use of the airwaves and mails for the promotion of such lotteries. See *ante*, at 421–423. Rather, the federal interest in this case is entirely derivative. By tying the right to broadcast advertising regarding a state-run lottery to whether the State in which the broadcaster is located itself sponsors a lottery, Congress sought to support nonlottery States in their efforts to "discourag[e] public participation in lotteries." *Ante*, at 422–423, 434.[1]

Even assuming that nonlottery States desire such assistance from the Federal Government—an assumption that must be made without any supporting evidence—I would hold that suppressing truthful advertising regarding a neighboring State's lottery, an activity which is, of course, perfectly legal, is a patently unconstitutional means of effectuating the Government's asserted interest in protecting the policies of nonlottery States. Indeed, I had thought that we had so held almost two decades ago.

In *Bigelow* v. *Virginia*, 421 U.S. 809 (1975), this Court recognized that a State had a legitimate interest in protecting the welfare of its citizens as they ventured outside the State's borders. *Id.*, at 824. We flatly rejected the notion, however, that a State could effectuate that interest by suppressing truthful, nonmisleading information regarding a legal activity in another State. We held that a State "may

---

[1] At one point in its opinion, the Court identifies the relevant federal interest as "supporting North Carolina's laws making lotteries illegal." *Ante*, at 429. Of course, North Carolina law does not, and, presumably, could not, bar its citizens from traveling across the state line and participating in the Virginia lottery. North Carolina law does not make the Virginia lottery illegal. I take the Court to mean that North Carolina's decision not to institute a state-run lottery reflects its policy judgment that participation in such lotteries, even those conducted by another State, is detrimental to the public welfare, and that 18 U.S.C. § 1307 (1988 ed. and Supp. III) represents a federal effort to respect that policy judgment.

not, under the guise of exercising internal police powers, bar a citizen of another State from disseminating information about an activity that is legal in that State." *Id.*, at 824–825. To be sure, the advertising in *Bigelow* related to abortion, a constitutionally protected right, and the Court in *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S. 328 (1986), relied on that fact in dismissing the force of our holding in that case, see *id.*, at 345. But even a casual reading of *Bigelow* demonstrates that the case cannot fairly be read so narrowly. The fact that the information in the advertisement related to abortion was only one factor informing the Court's determination that there were substantial First Amendment interests at stake in the State's attempt to suppress truthful advertising about a legal activity in another State:

> "Viewed in its entirety, the advertisement conveyed information of potential interest and value to a diverse audience—not only to readers possibly in need of the services offered, but also to those with a general curiosity about, or genuine interest in, the subject matter or the law of another State and its development, and to readers seeking reform in Virginia. The mere existence of the [organization advertising abortion-related services] in New York City, with the possibility of its being typical of other organizations there, and the availability of the services offered, were not unnewsworthy. Also the activity advertised pertained to constitutional interests." *Bigelow*, 421 U. S., at 822.[2]

---

[2] The analogy to *Bigelow* and this case is even closer than one might think. The North Carolina General Assembly is currently considering whether to institute a state-operated lottery. See 1993 N. C. S. Bill No. 11, 140th Gen. Assembly. As with the advertising at issue in *Bigelow*, then, advertising relating to the Virginia lottery may be of interest to those in North Carolina who are currently debating whether that State should join the ranks of the growing number of States that sponsor a lottery. See *infra*, at 441.

*Bigelow* is not about a woman's constitutionally protected right to terminate a pregnancy.[3] It is about paternalism, and informational protectionism. It is about one State's interference with its citizens' fundamental constitutional right to travel in a state of enlightenment, not government-induced ignorance. Cf. *Shapiro* v. *Thompson,* 394 U. S. 618, 629–631 (1969).[4] I would reaffirm this basic First Amendment principle. In seeking to assist nonlottery States in their efforts to shield their citizens from the perceived dangers emanating from a neighboring State's lottery, the Federal Government has not regulated the content of such advertisements to ensure that they are not misleading, nor has it provided for the distribution of more speech, such as warnings or educational information about gambling. Rather, the United States has selected the most intrusive, and dangerous, form of regulation possible—a ban on truthful information regarding a lawful activity imposed for the purpose of manipulating, through ignorance, the consumer choices of some of its citizens. Unless justified by a truly substantial governmental interest, this extreme, and extremely paternalistic, measure surely cannot withstand scrutiny under the First Amendment.

---

[3] If anything, the fact that underlying conduct is not constitutionally protected increases, not decreases, the value of unfettered exchange of information across state lines. When a State has proscribed a certain product or service, its citizens are all the more dependent on truthful information regarding the policies and practices of other States. Cf. *Bray* v. *Alexandria Women's Health Clinic,* 506 U. S. 263, 332 (1993) (STEVENS, J., dissenting). The alternative is to view individuals as more in the nature of captives of their respective States than as free citizens of a larger polity.

[4] "For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States." *Passenger Cases,* 7 How. 283, 492 (1849).

No such interest is asserted in this case. With barely a whisper of analysis, the Court concludes that a State's interest in discouraging lottery participation by its citizens is surely "substantial"—a necessary prerequisite to sustain a restriction on commercial speech, see *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U. S. 557, 566 (1980)—because gambling "falls into a category of 'vice' activity that could be, and frequently has been, banned altogether," *ante*, at 426.

I disagree. While a State may indeed have *an interest* in discouraging its citizens from participating in state-run lotteries,[5] it does not necessarily follow that its interest is "substantial" enough to justify an infringement on constitutionally protected speech,[6] especially one as draconian as the regulation at issue in this case. In my view, the sea change in public attitudes toward state-run lotteries that this country has witnessed in recent years undermines any claim that a State's interest in discouraging its citizens from participating in state-run lotteries is so substantial as to outweigh respondent's First Amendment right to distribute, and the public's right to receive, truthful, nonmisleading information about a perfectly legal activity conducted in a neighboring State.

While the Court begins its opinion with a discussion of the federal and state efforts in the 19th century to restrict lotteries, it largely ignores the fact that today hostility to state-run lotteries is the exception rather than the norm.

---

[5] A State might reasonably conclude, for example, that lotteries play on the hopes of those least able to afford to purchase lottery tickets, and that its citizens would be better served by spending their money on more promising investments. The fact that I happen to share these concerns regarding state-sponsored lotteries is, of course, irrelevant to the proper analysis of the legal issue.

[6] See, *e. g., Cincinnati* v. *Discovery Network, Inc.*, 507 U. S. 410, 417, n. 13 (1993) (noting that restrictions on commercial speech are subject to more searching scrutiny than mere "rational basis" review).

Thirty-four States and the District of Columbia now sponsor a lottery.[7] Three more States will initiate lotteries this year.[8] Of the remaining 13 States, at least 5 States have recently considered or are currently considering establishing a lottery.[9] In fact, even the State of North Carolina, whose antilottery policies the Federal Government's advertising ban are purportedly buttressing in this case, is considering establishing a lottery. See 1993 N. C. S. Bill No. 11, 140th Gen. Assembly. According to one estimate, by the end of this decade all but two States (Utah and Nevada) will have state-run lotteries.[10]

The fact that the vast majority of the States currently sponsor a lottery, and that soon virtually all of them will do so, does not, of course, preclude an outlier State from following a different course and attempting to discourage its citizens from partaking of such activities. But just as the fact that "the vast majority of the 50 States . . . prohibit[ed] casino gambling" purported to inform the Court's conclusion in *Posadas de Puerto Rico Associates* v. *Tourism Co. of P. R.*, 478 U. S., at 341, that Puerto Rico had a "substantial" interest in discouraging such gambling, the national trend in the opposite direction in this case surely undermines the United States' contention that nonlottery States have a "substantial" interest in discouraging their citizens from traveling across state lines and participating in a neighboring State's lottery. The Federal Government and the States simply do not have an overriding or "substantial" interest in

---

[7] Selinger, Special Report: Marketing State Lotteries, City and State 14 (May 24, 1993).

[8] *Ibid.*

[9] See, *e. g.*, 1993 Ala. H. Bill No. 75, 165th Legislature—Regular Sess.; 1993 Miss. S. Concurrent Res. No. 566, 162d Legislature—Regular Sess.; 1993 N. M. S. Bill No. 141, 41st Legislature—First Regular Sess.; 1993 N. C. S. Bill No. 11, 140th Gen. Assembly; 1993 Okla. H. Bill No. 1348, 44th Legislature—First Regular Sess.

[10] Selinger, *supra.*

seeking to discourage what virtually the entire country is embracing, and certainly not an interest that can justify a restriction on constitutionally protected speech as sweeping as the one the Court today sustains.

I respectfully dissent.