VERIZON NORTHWEST, INC.; Bell Atlantic Communications, Inc., d/b/a, Verizon Long Distance; Nynex Long Distance, d/b/a Verizon Enterprise Solutions; Verizon Select Services, Inc., and Verizon Services Corporation, Plaintiffs,

v.

Marilyn SHOWALTER, Chairwoman; Patrick Oshie and Richard Hemstad, Commissioners, in their official capacities as members of the Washington Utilities and Transportation Commission, and Washington Utilities and Transportation Commission, Defendants.

No. C02–2342R.

United States District Court, W.D. Washington, at Seattle.

Aug. 26, 2003.

Andrew G. McBride, Kathryn L. Comerford, Wiley, Rein & Fielding, Washington, DC, Kendall Joy Fisher, Timothy J. O'Connell, Stoel Rives LLP, Seattle, WA, for Plaintiffs.

Jeffrey David Goltz, Attorney General's Office Administration, Olympia, WA, Joel R. Reidenberg, Fordham University of Law, New York City, Jonathan Craig Thompson, Attorney General's Office, Olympia, WA, for Defendants.

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROTHSTEIN, District Judge.

THIS MATTER comes before the court on cross-motions for summary judgment. Having reviewed the pleadings filed in support of and in opposition to these motions, and having heard oral argument, the court finds and rules as follows:

## I. BACKGROUND

This case involves state regulation of a telecommunications carrier's ability to use Customer Proprietary Network Information ("CPNI"). Generally, CPNI is information collected by telecommunications service providers in the process of delivering their service. As defined under federal law, CPNI is

(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and

(B) information contained in the bills pertaining to telephone exchange service

or telephone toll service received by a customer of a carrier; except that such term does not include subscriber list information.

47 U.S.C. § 222 (2001). For instance, CPNI includes information about calls made and received such as whether they were local or long distance, time of day of the call, the originating and destination phone numbers, and whether the call was answered or the line was busy. CPNI also includes information about the services to which a customer subscribes such as call forwarding or caller identification.

On November 7, 2002, the Washington Utilities and Transportation Commission ("WUTC") adopted new regulations limiting a telecommunications carrier's ability to use CPNI without the express authorization of its customers. The WUTC divided CPNI into two categories: "call detail" and "private account information." Call detail is

> [a]ny information that identifies or reveals for any specific call, the name of the caller (including name of a company, entity, or organization), the name of any person called, the location from which a call was made, the area code, prefix, any part of the telephone number of any participant, the time of day of a call, the duration of a call, or the cost of a call . . .
>
> [and] information associating a specific customer or telephone number with the number of calls that are answered or unanswered, correlated with a time of the day, day of the week, week or weeks, or by any time period shorter than one month.

WAC § 480–120–201.[1] Private account information is other information that a carrier has access to regarding its customers that uniquely identifies customers but that is not call detail. *Id.* Such information includes the customer's name or address.

Under the new regulations, a telecommunications carrier cannot disclose either "call detail" or "private account information" to third parties outside the carrier's organization without a consumer's explicit authorization. As to in-company use, carriers must provide customers the opportunity to opt-out of that carrier's use of "private account information" for "out-of-category" marketing.[2] Use of private account information for "same-category" marketing is not restricted. A carrier must first obtain a customer's explicit approval ("opt-in") before using "call detail" for *any* purpose other than billing.

Plaintiffs, collectively referred to as Verizon, allege that these regulations are preempted by federal law and violate the First Amendment's commercial speech protections. Verizon also alleges that the rules violate the Commerce Clause. Accordingly, they seek a permanent injunction against the enforcement of the regulations.[3] Each party has filed for summary judgment.

## II. DISCUSSION

### A. *Summary judgment standard*

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

---

**1.** Call detail also includes various types of aggregations of such information on monthly, less-than-monthly, and more-than-monthly bases.

**2.** "Out-of-category" marketing is the marketing of a category of services to which a customer does not already subscribe. "Same

category" marketing is the marketing of a category of services to which a customer already subscribes.

**3.** To the extent that the restrictions on third-party disclosure mirror those imposed by the FCC, such restrictions are not at issue here.

56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In the present case, there are no disputes of material facts.[4] Consequently, summary judgment is appropriate if either Verizon or the WUTC is entitled to judgment as a matter of law.

## B. *Abstention*

■ Defendants, collectively referred to as the WUTC, contend that this court should abstain from considering the issues in this case under the doctrine set forth in *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Under that doctrine, known as *"Pullman* abstention", a federal court should abstain

> only if each of the following three factors is present: (1) the case touches on a sensitive area of social policy upon which the federal courts ought not enter unless no alternative to its adjudication is open, (2) constitutional adjudication plainly can be avoided if a definite ruling on the state issue would terminate the controversy, and (3) the proper resolution of the possible determinative issue of state law is uncertain.

*Porter v. Jones,* 319 F.3d 483, 492 (9th Cir.2003) (internal quotes omitted). In First Amendment cases, however, "the first *Pullman* factor 'will almost never be present because the guarantee of free expression is always an area of particular federal concern.'" *Id.* (quoting *Ripplinger v. Collins,* 868 F.2d 1043, 1048 (9th Cir.1989)). Abstention is particularly inappropriate in a case such as this where abstention will "force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings ... [that] might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota,* 389 U.S. 241, 252, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). In only one case has the Ninth Circuit found abstention to be appropriate in the context of a First Amendment Claim. *See Almodovar v. Reiner,* 832 F.2d 1138, 1140 (9th Cir.1987). That case, however, involved an "unusual procedural setting; the issue in question was already before the state supreme court." *Porter,* 319 F.3d at 493–94. The fears of a chilling effect, therefore, did not justify a preference against abstention. *Id.* at 494.

In the present case, there are no proceedings currently pending before any state court or administrative body. Given the likely delay involved with any state court ruling on this matter, the court finds that abstention is not appropriate. *Porter,* 319 F.3d at 494.

## C. *Verizon's First Amendment challenge*

### 1. *Is speech implicated?*

■ The WUTC contends that because the rules regulate the *use* of CPNI, the regulations do not implicate the First Amendment. According to the WUTC, the rules only regulate a commercial transaction between a telecommunications carrier and its customers, and as such, do not directly implicate any expressive activity. *See U.S. West, Inc. v. F.C.C.,* 182 F.3d 1224, 1244 (10th Cir.1999) (Briscoe, J., dissenting). The rules do, however, indirectly affect Verizon's marketing by requiring prior customer approval for the use of CPNI in both developing and targeting that marketing.[5] WUTC Order ¶ 63;

---

**4.** The parties dispute the extent to which Verizon currently uses or will use CPNI within its organization. While such a dispute may have been relevant at the preliminary injunction phase of this litigation, it is not relevant to any material fact at the present stage.

**5.** "[T]he fact that no direct restraint or punishment is imposed upon speech or assembly does not determine the free speech question. Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines,

Blackmon Decl. ¶ 6 (noting that the new regulations "do restrict Verizon from some marketing activities that it might otherwise engage in"). Such targeted marketing is protected commercial speech.[6] *Florida Bar v. Went for It, Inc.,* 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541 (targeted speech is commercial speech whose restriction implicates the First Amendment). Furthermore, "the existence of alternative channels of communication, such as broadcast speech, does not eliminate the fact that the CPNI regulations restrict speech." *U.S. West,* 182 F.3d at 1232 (holding that the FCC's 1998 CPNI regulations that required opt-in approval by customers impacted a carrier's commercial speech interests).[7] This is not a case where a state law or regulation simply makes speech more expensive, less convenient, or even less effective. Rather the regulations at issue here directly affect what can and cannot be said. Such a restriction, no matter how indirect, implicates the First Amendment. *Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.,* 487 U.S. 781, 790 n. 5, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (finding First Amendment implicated where "effect of the statute is to encourage some forms of solicitation and discourage others"). Accordingly, the court finds that the WUTC regulations impact protected speech.

### 2. Central Hudson test

■ Given that Verizon's commercial speech interests are implicated, the WUTC's regulations must be analyzed under the intermediate-scrutiny standard set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Under *Central Hudson,* a restriction on truthful and non-misleading commercial speech is valid if the government establishes (1) that there is a substantial state interest in regulating the speech; (2) the regulation directly and materially advances that interest; and (3) the regulation is no more extensive than necessary to serve the interest.[8] *Central Hudson,* 447 U.S. at 564–65, 100 S.Ct. 2343.

### a. Substantial state interest

■ It is well settled that "the protection of . . . privacy is a substantial state interest." *Went for It,* 515 U.S. at 625, 115 S.Ct. 2371 (quoting *Edenfield v. Fane,* 507 U.S. 761, 769, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)). The "State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). In light of this interest, a state may legislate to protect privacy and "avoid intrusions." *Frisby v. Schultz,* 487 U.S. 474, 484–85, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

Verizon argues, however, that there is no privacy interest between a telecommunications carrier and an *existing* customer regarding that customer's use of services. Verizon points to the FCC's position that

---

injunctions or taxes." *Am. Communications Ass'n, C.I.O., v. Douds,* 339 U.S. 382, 402, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

**6.** The speech is undoubtedly commercial speech as the targeted speech to customers "is for the purpose of soliciting those customers to purchase more or different telecommunications services [and] 'does no more than propose a commercial transaction.'" *U.S. West,* 182 F.3d at 1232 (quoting *Va. State Bd.*

*of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 760, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)).

**7.** In fact, aside from billing and providing customer support, there is little other use to which CPNI can be put other than as a foundation for marketing.

**8.** It is undisputed that Verizon's speech is lawful and non-misleading.

customer approval of the use of CPNI can be inferred. *In re Implementation of Telecommunications Act of 1996*, 13 F.C.C.R. 8061, ¶ 23, 1998 WL 80480 (Feb. 26, 1998)("the customer is aware that his carrier has access to CPNI, and, through subscription to the carrier's service, has implicitly approved the carrier's use of CPNI within that existing relationship"). This inference, though, does not support a further inference that there is no privacy interest at all. In fact, in promulgating its new rules after *U.S. West*, the FCC emphatically concluded that the government *has* a substantial interest at least "in ensuring that a customer be given an opportunity to approve (or disapprove) uses of her CPNI by a carrier and a carrier's affiliates." *In re Implementation of the Telecommunications Act of 1996*, 17 F.C.C.R. 14,860, ¶ 31, 2002 WL 1726815 (July 25, 2002).

In response, the WUTC points out that the Washington constitution contains a protected right to privacy that runs against private as well as governmental invasions. Wash. Const. art. I, § 7. It is also wrongful in Washington, and a basis for civil liability, to register the phone numbers dialed from a particular phone. *State v. Gunwall*, 106 Wash.2d 54, 69, 720 P.2d 808 (1986); RCW 9.73.260 (requiring court order to use devices that record the numbers of inbound and outbound phone calls but exempting telecommunications service devices used for billing or as an incident to billing). In other words, there is a strong presumption in Washington in favor of privacy when it comes to CPNI.

Furthermore, the record before the court contains various studies indicating public concern about the use and dissemination of personal information collected by telecommunications carriers during the provision of service. *See, e.g.,* AR 533, 563–64, 1040; *see also* Ex. 3, Hoffman Decl. at 39 (finding that 53 percent of those interviewed said that it was a major concern of theirs that a company will use information outside of a specific transaction for which it was intended). The record also contains over 600 comments by private individuals expressing a concern over privacy and the need to regulate corporate use of personal information. Contrary to Verizon's contention, there is evidence in the record that consumers have a privacy interest in the use of information derived from an existing business relationship. Given this record and the FCC's findings, the court finds that there is a substantial state interest in ensuring that consumers be given an opportunity to approve uses of their CPNI.

b. *Directly and materially advancing state interest*

■ Under *Central Hudson's* second prong, the WUTC must demonstrate that the challenged regulation "advances the Government's interest 'in a direct and material way.'" *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (quoting *Edenfield,* 507 U.S. at 767, 113 S.Ct. 1792). A "regulation may not be sustained if it provides only ineffective or remote support for the government's purpose." *Central Hudson*, 447 U.S. at 564, 100 S.Ct. 2343.

In arguing that the WUTC's regulations fail this requirement, Verizon points out that the regulations affect only traditional landline carriers and exclude other utilities, more particularly, wireless carriers. Thus, Verizon contends, the WUTC's rules are so underinclusive as to not advance the WUTC's purported state interest in a direct and material way. *See Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 98 (2d Cir.1998) (extent of underinclusiveness is relevant factor to whether a regulation materially advances state interest). The WUTC responds that

the underinclusiveness of the rules is not fatal as there is no requirement that the whole of the problem relating to CPNI use be addressed at once. *See United States v. Edge Broadcasting Co.*, 509 U.S. 418, 434, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993) ("we [do not] require that the Government make progress on every front before it can make progress on any front"). A state, however, "may not avoid the criterion of materially advancing its interest by authorizing only one component of its regulatory machinery to attack a narrow manifestation of a perceived problem." *Bad Frog Brewery*, 134 F.3d at 99–100. Rather, the state "must demonstrate that its commercial speech limitation is part of a substantial effort to advance a valid state interest, not merely the removal of a few grains of offensive sand from a beach." *Id.* at 100.

Under the WUTC's rules, consumers face different rules regarding the use of CPNI if they use wireless and interstate telecommunications services in addition to the intrastate services to which the WUTC's rules apply. Furthermore, the exclusion of wireless services from the regulations leaves a large segment of services free from the protections offered by the WUTC's restrictions. The WUTC, therefore, fails to establish that its rules are part of a substantial effort to advance a valid state interest.

More importantly, though, even within the context of traditional landline carriers, a cursory examination of the WUTC's regulations makes clear that they are dauntingly confusing and riddled with exceptions. The new rules incomprehensibly divide CPNI into call detail and private account information, requiring consumers to opt-in in some cases and opt-out in others. As Washington's Public Counsel recognized, the "dual system is unnecessarily complicated and may make it more difficult for the customer to understand that any action is needed to prevent use

and dissemination of their private account information in light of [the] opt-in requirement for call detail." AR 1010. The court agrees. Consumers report that "they want uniform policies and concise and understandable notices." Hoffman Decl. ¶ 26. In the present case, it defies credulity that consumers will understand the complicated regulatory framework sufficiently to effectively implement their preferences. Simply put, the state's interest will not be advanced given the confusion over the regulations. For these reasons, the court finds that the WUTC's rules fail to advance the state's interest in a direct and material way. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (striking down ban on advertising liquor prices because there was no evidence in the record to suggest that a tenuous chain of events necessary to advance state interest would actually occur); *Coors Brewing*, 514 U.S. at 488, 115 S.Ct. 1585 (regulations do not directly and materially advance state interest "because of the overall irrationality of the Government's regulatory scheme"); *see also W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1095 (9th Cir.2001) (finding that regulations are "so riddled with exceptions that it is unlikely that the speech restrictions would actually succeed in ... directly advanc[ing] the government's interest").

### c. Narrow tailoring

■ The regulations also fail to satisfy the "narrow tailoring" prong of the *Central Hudson* test. Under that prong, the WUTC must demonstrate that the regulations are "no more extensive than necessary to serve the stated interests." *U.S. West*, 182 F.3d at 1238 (quoting *Coors Brewing*, 514 U.S. at 486, 115 S.Ct. 1585). Though this test does not require that the least restrictive means of regulation be adopted, the means must be reasonable

and represent a disposition "whose scope is in proportion to the interest served." *Bd. of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). To be narrowly tailored, the government's speech restriction must signify a careful calculation of the costs and benefits associated with the burden on speech imposed by its prohibition. *Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 417, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). "The availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny." *44 Liquormart,* 517 U.S. at 529, 116 S.Ct. 1495 (O'Connor, J., concurring).

In *U.S. West,* the Tenth Circuit struck down the FCC's opt-in regime holding that it was clear from the record that the FCC had not considered less restrictive opt-out alternatives. This led the court to conclude that the FCC necessarily had not narrowly tailored its regulations. 182 F.3d at 1238–39.

While the WUTC explicitly considered and rejected an opt-out approach, WUTC Order ¶¶ 84–88, its regulations are subject to the same criticism as that expressed by the *U.S. West* court. This court finds that there are other means available to achieve the same purpose that impact less speech. For instance the state could more stringently regulate the form and content of opt-out notices and combine those regulations with educational campaigns to inform consumers of their rights.

The WUTC contends, however, that opt-in is the only approach that will protect CPNI. The WUTC points to evidence in the record derived from the Qwest experi-

ence with opt-out to demonstrate that opt-out approaches are fundamentally flawed. WUTC Order ¶ 85; AR 1085–86 (discussing ineffectiveness of opt-out), 328–329 ("Recent surveys demonstrate that consumers either never see and read such complicated opt-out notices, or they don't understand them."). For these reasons, the WUTC argues, opt-out approaches do not provide consumers with an opportunity to properly express their privacy preferences.

The evidence upon which the WUTC relies, however, does not invalidate opt-out approaches. Rather, it is evident that the *presentation* and *form* of opt-out notices is what determines whether an opt-out campaign enables consumers to express their privacy preferences. The FCC recognized this very fact when it devoted a substantial portion of its 2002 Order to dictating the form, content, and frequency of opt-out notices. *See* 17 F.C.C.R. 14,860, ¶¶ 89–119; *see also id.* ¶ 89 ("we adopt more stringent notice requirements to ensure that customers are in a position to comprehend their choices and express their preferences regarding the use of their CPNI").

In the present case, there is no evidence that the WUTC considered similar requirements. Instead, it appears as though the WUTC was motivated by consumer complaints regarding the implementation of Qwest's opt-out campaign. Undoubtedly, the Qwest experience did not go well.[9] That experience, however, does not support the proposition that *all* opt-out presentations are flawed. In fact, Verizon's recent experience implementing opt-out in accordance with the FCC rules in Washington stands in stark contrast to Qwest's.

---

**9.** For instance, the record is replete with complaints from Qwest customers that phone lines were busy, the web-based opt-out system was unresponsive and failed to give any confirmation, and that the notice was sent as a billing insert.

Verizon sent out opt-out notices to approximately 700,000 subscribers; 7.5 percent successfully opted out and fewer than 45 subscribers lodged any complaint.[10]  *See* LaPorta Dep. 81:15–84:20, 90:1–19, 97:4–98:8.  Verizon's experience strongly suggests that properly controlled opt-out campaigns can protect consumers from the unauthorized use of CPNI without impacting speech to the extent that the current rules do.  That experience, along with the FCC's, demonstrates that regulations that address the form, content, and timing of opt-out notices, when coupled with a campaign to inform consumers of their rights, can ensure that consumers are able to properly express their privacy preferences.  *See 44 Liquormart*, 517 U.S. at 507, 116 S.Ct. 1495 (educational campaigns may be more effective at advancing state interest than speech-restricting regulation); *Linmark Assoc., Inc. v. Willingboro Township*, 431 U.S. 85, 97, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (government is free to engage in its own speech and engage in widespread publicity to educate the public about the interest being advanced).  The existence of these less-restrictive alternatives indicates that the regulations are not narrowly tailored.  *See U.S. West*, 182 F.3d at 1239; *see also 44 Liquormart*, 517 U.S. at 507–08, 116 S.Ct. 1495 (holding that there was no "reasonable fit" between regulations and the state's interest where "[i]t is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more

likely to achieve the State's goal"); *Project 80's v. City of Pocatello*, 942 F.2d 635, 638 (9th Cir.1991) ("restrictions which disregard far less restrictive and more precise means are not narrowly tailored").

## III.  CONCLUSION

Accordingly, the court finds that though there is a substantial state interest in protecting against the unconsented use of CPNI, the WUTC regulations do not advance that interest in a direct and material way and are not narrowly tailored.  The current rules, therefore, fail the *Central Hudson* test and are contrary to the First Amendment.[11]

For all the foregoing reasons, the court GRANTS Verizon's motion for summary judgment [docket no. 84].  Defendants' motion for summary judgment [docket no. 75] is DENIED.[12]  It is hereby ADJUDGED and ORDERED that Defendants are permanently enjoined from enforcement of WAC 480–120–201 to 216.

---

**10.**  Verizon's campaign differed from Qwest's in several key aspects, e.g. opt-out notices were sent in separate envelopes rather than being sent along with a bill.

**11.**  The court does not reach Verizon's claims that the rules are preempted by federal law or the dormant commerce clause or that they are void for vagueness.

**12.**  Defendants' motion to strike are themselves stricken as the court has not based its decision on any of the extra-record evidence introduced by Plaintiffs and as Defendants have not complied with local rules pertaining to motions to strike.